IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-1849 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| FIRST FINANCIAL CORPORATE | ) | |
| SERVICES, INC., THOMAS SLEVIN, | ) | |
| and RICHARD STEBBINS, | ) | |
| | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Ross brings this diversity action against Defendants First Financial Corporate Services, Inc., Thomas Slevin, and Richard Stebbins (collectively, "Defendants") seeking damages and declaratory judgment for claims that arise under Illinois law. Before the Court are cross-motions for summary judgment by Defendants [66] and Plaintiff [72]. For the reasons set forth below, Defendants' motion [66] is granted, and Plaintiff's [72] is denied. A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Plaintiff. Civil case terminated.

I. **Background**

These facts are taken from the parties' respective Local Rule 56.1 statements, responses, and supporting exhibits [68, 73, 74, 76]. The Court is also entitled to consider any material in the record, even if it is not cited by either party. Fed. R. Civ. P. 56(c)(3). The Court's decision to cite "as undisputed a statement of fact that a party has attempted to dispute, [ ] reflects [its] determination that the evidence cited in the response does not show that the fact is in genuine dispute." *NAR Bus. Park, LLC v. Ozark Auto. Distribs., LLC*, 430 F. Supp. 3d 443, 446–47 (N.D. Ill. 2019).

## A.     Factual Background

Plaintiff Michael Ross lives in Long Beach, Indiana, and maintains another residence in Elmhurst, Illinois. [73 at ¶ 2.]  Defendant First Financial is a Nevada corporation headquartered in Orange County, California, but also maintains offices in the Northern District of Illinois, where Ross was employed. [*Id.* at ¶¶ 1, 6.]  The company sells leases to customers throughout the United States for a variety of types of high-cost capital equipment, including medical, material handling, and information technology equipment. [*Id.* at ¶ 5.]  Defendants Slevin and Stebbins formerly served as co-presidents of First Financial; Slevin resides in San Francisco, California, and Stebbins in Fullerton, California. [*Id.* at ¶ 3–4.]  Ross worked as a salesperson at First Financial from April 16, 2010, until his resignation from the company in January 2018.  [73 at ¶¶ 8, 9.]  Ross acknowledges that he was an at-will employee at First Financial. [*Id.* at ¶ 76.]

Ross's job duties involved marketing and selling the leasing products offered by First Financial. [73 at ¶ 10.]  In his position at the company, Ross was eligible to receive commissions as a portion of his compensation. [*Id.* at ¶ 11.]  On March 16, 2010, Ross and First Financial entered into a Sales Employee Agreement, which outlined the commission payment structure as follows:

> [First Financial] will pay [Ross] monthly for any commissions due from transactions that closed in the previous month.  A closed transaction is defined as one where all documentation is computer and the vendor has been paid, and in those cases where debt and/or equity is required, the debt and/or equity is placed and all documents are completed, and [First Financial] is in receipt of the funds.

[*Id.* at ¶¶ 12–13.]  From March 16, 2010, until January 1, 2017, First Financial paid commissions to Ross in accordance with the Sales Employee Agreement and annual commission plans issued each year by First Financial and signed by Ross. [*Id.* at ¶ 14; 76 at ¶ 3.]  Each Commission Plan was titled "Commissions for New Lease Originations for First Financial Corporate Services, Inc."

and stated that the plans were in effect for the respective calendar year. [76 at ¶¶ 4, 68.] Plaintiff's claims stem from his belief that he is owed commissions that he earned during his time at First Financial.

Under the commission plans issued between 2010 and 2016, when Ross sold a new lease, he was entitled to a commission that was based on the present value of the lease and the acquisition costs for the equipment. [73 at ¶ 15.] The present value of the lease was calculated by the sum of the principal amount to be paid over the course of the lease and interest calculated by using a present value interest rate. [*Id.* at ¶ 16.] The acquisition costs were determined by the expenses First Financial incurred in acquiring the equipment, less freight costs. [*Id.* at ¶ 17.] Ross's commissions were then calculated as a percentage of the acquisition costs (which varied based on the present value of the lease), the length of the lease, and the type of equipment being leased [*id.* at ¶ 18]. A lease with a higher present value (calculated as a percentage of the lease's future value) entitled Ross to a greater percentage of the acquisition costs to be paid to him as commission. For example, under the 2010 commission plan, if Ross sold a 3-year lease on medical equipment, Ross would earn a commission of 1.8% of the acquisition costs if the present value of the lease amounted to 89% or higher, but would earn a commission of only 1.5% of the acquisition costs if the present value of the lease fell between 82% and 88.9% of the future value. [*Id.* at ¶¶ 19–20.]

Until January 1, 2017, the commission plans also included sales incentives, which enabled Ross to earn even higher commissions on sales completed after Ross had already met his sales quota for the year. [73 at ¶ 21.] The structure for calculating commissions earned on those sales was the same as the pre-quota commissions structure, but for post-quota sales, Ross would earn a higher percentage of the acquisition costs than he would have earned on the same sale completed

3

before he met his quota. [*Id.* at ¶ 22.] Under those commission plans, Ross received his commission at the beginning of the lease's term. [*Id.* at ¶ 23.]

The commission plans also gave Ross the opportunity to earn commissions on "margin transactions," which typically occurred at the end of the lease, such as an extension of the term of the lease, a sale of the leased equipment to the customer, or short term (monthly or quarterly) equipment rentals beyond the term of the original lease. [73 at ¶ 24.] Through 2016, Ross would receive a commission of 35% of the margin sales completed prior to meeting his quota, and 40% of those margin transactions after Ross had met his sales quota for the year. [*Id.* at ¶¶ 24–25.] Margin transactions generated higher commission rates than standard lease sales because they enable First Financial to fully recover its equipment acquisition costs and earn a profit on its original investment in the capital equipment, whereas under standard leases, First Financial would only partially recoup its equipment acquisition costs. [*Id.* at ¶ 26.] Commissions for margin transactions would only become payable after the payments received under the lease exceeded the amount necessary for the lease to become economically profitable to First Financial which was called "threshold." [76 at ¶ 8.]

In 2017, First Financial released a new commission plan which Ross signed on February 20, 2017. [73 at ¶ 27.] Under the 2017 commission plan, commissions earned on new lease transactions were calculated in the same way as years prior, enabling Ross to receive a commission based on the percentage of acquisition costs and an increase in that percentage for sales completed after Ross met his sales quota. [*Id.* at ¶ 28.] For margin transactions, however, the 2017 plan established a new commission structure. [*Id.* at ¶ 29.] The plan included a new $7 million sales quota incentive. Specifically, the 2017 plan established that unless and until Ross sold $7 million in fair market leases in 2017, he would earn only a 20% commission on margin transactions that

occurred in 2017 but which were related to leases originated prior to January 1, 2017. [*Id.*; 76 at ¶ 11.] But, if Ross met his $7 million sales quota, he would earn a 35% commission on margin transactions that took place in 2017, regardless of whether the transactions took place before or after Ross met the $7 million quota. [73 at ¶ 30.] The new commission structure was intended to incentivize sales representatives to increase new lease originations so that First Financial could grow its business. [76 at ¶ 12.]

Ross received a copy of the 2017 Commission Plan by email on February 14, 2017. [76 at ¶ 14.] Among other instructions, the email stated in bold print: "you will not be paid commissions until this is signed and received by management." [*Id.* at ¶ 15.] Ross signed the 2017 plan because he felt he did not have a choice [*id.* at ¶ 17], but he objected to certain aspects of the new commission structure. Ross took issue with the policy paying him only 20% in commission for margin transactions that occurred in 2017 related to leases originated in prior years that had since gone into the "remarketing phase." [73 at ¶ 31.] At First Financial, the "remarketing phase" refers to the point at which the original lease reaches maturity. [*Id.*] When a lease enters the remarketing phase, a salesperson—like Ross—must try to create a margin transaction such as extending the lease term, purchasing the equipment, or continuing to lease the equipment on a month-to-month or quarter-to-quarter basis. Leases in the remarketing phase are typically at or near "threshold," which refers to the point at which First Financial begins to realize profit from the lease and subsequent margin transactions on the equipment. [*Id.* at ¶ 32.] First Financial calculates the "threshold" amount for each lease and communicates that information to its salespeople when they originate a new lease. [*Id.*; 76 at ¶ 9.] Commissions earned from margin transactions became payable to the salesperson only after the lease reached its designated threshold. [76 at ¶ 8.]

5

Ross believes that he is owed commissions of 35%—rather than the 20% he was paid—on two types of transactions: (1) margin transactions that he completed in 2017, but which related to leases that he originated prior to January 1, 2017 [73 at ¶ 33]; and (2) margin transactions that he completed in 2017 related to leases that originated prior to January 1, 2017, but which did not enter remarketing phase until 2017 [73 at ¶ 56]. The leases for which Ross seeks allegedly unpaid commissions reached threshold in 2015 and 2016. [*Id.* at ¶ 69.] For month-to-month margin transactions, the 2015 and 2016 commission plans state: "Month to Month (or quarter to quarter) margin will be credited and paid upon receipt of the payments from the Lessee based on excess margin about the Threshold amounts." [*Id.* at ¶ 70; 67-11 at 8.] That provision was altered slightly in the 2017 plan to state: "Commission for Month-to-Month Rents Collected will be paid based on receipt of any monthly rental paid by the original lease customer past the base term of the lease and those rents collected resulting in excess margin above Threshold." [73 at ¶ 71; 67-13 at 5 (emphasis in original).] For equipment sale margin transactions, the salesperson is eligible to receive a commission on the sale upon receipt of payment from the customer for the sale. [73 at ¶ 74.]

### B.    Procedural Background

Plaintiff initiated this action on March 15, 2019, by filing a complaint [1] in this Court pursuant to 28 U.S.C. § 1332. The operative second amended complaint [42] initially asserted four claims. Pursuant to the parties' stipulation [55], the Court dismissed one of those claims [56], but the other three remain active at this stage in the action. Count I asserts a breach-of-contract claim against First Financial; Count II claims violations of the Illinois Wage Payment and Collection Act ("IWPCA") against all Defendants; and Count IV seeks a declaratory judgment that the 2017 Commission Plan constitutes an unenforceable contract modification. Plaintiff seeks

damages for his unpaid commission in the amount of $343,933.69 plus statutory damages and attorneys' fees. The parties have filed cross-motions for summary judgment on all remaining claims. [66, 72.]

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

Defendants seek summary judgment on the grounds that based on the undisputed facts, Illinois law, and the plain language of relevant employment contracts, Defendants lawfully changed the terms under which Ross would receive commissions in 2017 and paid him accordingly. Plaintiff seeks summary judgment on two alternative grounds. First, he asserts that

the 2017 Commission Plan constitutes an illegal and invalid modification of the terms of his compensation. Second, he argues that, in any event, he earned the commissions for the margin transactions at issue in 2015 and 2016 when the related leases were originated.

### A. Breach of Contract

Plaintiff argues that Defendants failed to effectively amend Plaintiff's terms of compensation through the 2017 Commission Plan. He makes two main arguments in support of his claim: (1) the amendments attempted through the 2017 Plan lacked consideration; and (2) he did not accept the new terms of the 2017 Plan. Thus, according to Plaintiff, the 2017 Plan is unenforceable, and Defendants breached his previous employment contracts by paying Plaintiff 20% commission on certain 2017 margin transactions, rather than 35%. Alternatively, Plaintiff asserts that Defendants breached his employment agreement by retroactively reducing his commissions on margin transactions.

### 1. Consideration

As a preliminary matter, the Court must consider the type of contract modification Defendants sought to effectuate through the 2017 Commission Plan. If, as Plaintiff contends, the 2017 Plan attempts to change the structure of commissions already earned, standard contract elements—offer, acceptance, consideration—must exist for the 2017 Plan to become binding. See *Ross v. May Co.*, 880 N.E.2d 210, 215 (Ill. App. Ct. 2007) ("A valid modification must satisfy all criteria essential for a valid contract, including offer, acceptance, and consideration" (citations omitted)). On the other hand, if, as Defendants maintain, the 2017 Plan imposes only forward-looking changes to Plaintiff's commission structure, fewer elements are required for the Plan to be deemed valid. Under Illinois law, when, as here, "an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance." *Geary v. Telular Corp.*,

793 N.E.2d 128, 131 (Ill. App. Ct. 2003) (citations omitted). "This right to modify unilaterally at-will employment terms applies to modifying compensation terms" like commission plans. *Id.* In those circumstances, if an at-will employee "continues to work after a change in commission plan, he is deemed to have accepted the change." *Geary*, 793 N.E.2d at 131 (citing *Schoppert v. CCTC Int'l, Inc.*, 972 F.Supp. 444 (N.D. Ill. 1997)). "This is true even if the employee's continued performance is 'grudging and protest-filled.'" *Duberville v. WMG, Inc.*, 2015 WL 186834, at *8 (N.D. Ill. Jan. 13, 2015) (quoting *Geary*, 793 N.E.2d at 131).

As one step in the Court's analysis, it must determine the point at which Plaintiff is deemed to have earned commissions for margin transactions. The Court looks first to the plain language of the contract. See *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). "[T]he primary objective is to give effect to the intention of the parties," which is achieved by construing the contract "as a whole, viewing each provision in light of the other provisions." *Id.* "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Id.*

Plaintiff asserts that his "right to receive commissions under each prior commission plan arises upon the origination of the leases under the plans and thus is 'earned' at the time of the lease origination." [75 at 8.] Accordingly, "Defendants' obligation to pay such commissions occurs when Defendants receive each of the payments from the lessee required to be made under the leases." [*Id.*] Thus, Plaintiff concludes, he "earned his right to receive such commissions in the year the leases were originated." [*Id.*]

Plaintiff stakes his argument on language in the 2015 Commission Plan (and essentially included into the 2016 Plan though not explicitly labeled) which says "Commissions for New Lease Originations for First Financial Corporate Services, Inc." [75 at 7–8.] This language,

according to Plaintiff, unambiguously states that the plan "applies to all new lease originations in the calendar years in which the leases were originated but not retrospectively to prior years." [75 at 8.] The problem with Plaintiff's argument is that even if that fact is true by itself, Plaintiff's claim hinges on an additional unsupported proposition that all subsequent margin transactions are encompassed in "new lease originations."

Instead of turning to the 2015 and 2016 Commission Plans for more support, Plaintiff attempts to bolster his argument with logic, state administrative code provisions, and the broadly worded terms of the Sales Employee Agreement. First, Plaintiff asserts that pursuant to industry custom and First Financial's business model, it made sense that Plaintiff would earn margin transaction commissions when he originated the lease. [78 at 2-3.] Plaintiff reasons that "'the sale' in the leasing business" refers to the origination of the lease, leases generate revenue for First Financial, "revenue includes the revenue generated when a lessee elects to exercise one of the three end-of-lease options," and "revenue is the basis for paying commissions under First Financial's Commission Plans," thus margin transaction commissions are earned at the time of origination. [*Id.*]

Plaintiff next argues that when Section 300.501 of the IWPCA is applied to his Sales Employee Agreement, the result is that he "earned his commissions when he procured the leases for First Financial and the leases were executed by its customers." [78 at 4.] But the regulation to which Plaintiff cites establishes only that a "separated employee" has a right to earned commissions "when the conditions regarding entitlement to the commission have been satisfied, notwithstanding the fact that, due to the employee's separation from employment, the sale or other transaction was consummated by the principal personally or through another agent." 56 Ill. Admin. Code. § 300.510(a). It is unclear why Plaintiff cites to this particular regulation, as Plaintiff's

claim centers around his belief that he should have been paid a higher rate of commissions on margin transactions that he himself completed. Perhaps Plaintiff seeks to analogize the separated employee's post-termination right to commissions earned as an employee to his purported right to a specific rate of commission for margin transactions arising from lease originations for which Plaintiff already earned commissions on the underlying lease. That analogy is no more persuasive. Section 300.510 and the terms of Plaintiff's Sales Employee Agreement establish only that Plaintiff has a right to compensation for First Financial "Services to entities for which Employee has submitted transactions"—in other words, sales commissions—and that that right survives his termination. [See 67-5 at 2.] Defendants do not contest that Plaintiff is entitled to *a* commission; they simply dispute the time at which the commission is earned and thus the amount payable to Ross. Section 300.510 adds nothing to prove that commissions from subsequent margin transactions are earned at the time of origination.

Instead, the undisputed facts in this case and the plain language of the relevant employment contracts support Defendants' theory regarding the time at which margin transactions are earned. First, it is undisputed that margin transactions are *optional* for a lessee who purchases a standard equipment lease from First Financial. Plaintiff explains that a "typical" lease would "provide the lessee with four end of initial term *options*," and Defendants agree that at the end of an initial lease term, a lessee has four choices for how to proceed. [See 76 at ¶ 7.] Significantly—and undisputedly—one of those options was for the lessee to return the equipment to First Financial. [*Id.*] At the end of an initial lease, the lessee *could* engage in a margin transaction with First Financial, but the lessee also could opt to simply return the equipment, which would not generate any additional revenue for First Financial—and, correspondingly, no additional commission for its salespeople, like Plaintiff.

11

Commissions for margin transactions were significantly higher than for standard leases because "margin transactions are what enable First Financial to fully recover its equipment acquisition costs and realize a profit on its original investment in the capital equipment." [73 at ¶ 26.] Thus, when a standard lease is nearing its end, it is undisputed that the lease is considered to be in the "remarketing phase"—a phase in which the salesperson would try to "convince" the customer to extend the lease, purchase the equipment, or continue leasing the equipment on a month-to-month or quarter-to-quarter basis. [*Id.* at ¶ 72.] Common sense dictates that paying higher commissions on margin transactions is an effort by Defendants to incentivize its salespersons to induce the customer to pursue one of First Financial's most profitable transactions. See *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons" (citations omitted)).

Additionally, Plaintiff acknowledges that commissions from margin transactions are earned once First Financial receives payment from the customer. With respect to the equipment buyout option, Plaintiff admits that "the salesperson is eligible to receive a commission on the sale upon receipt of payment from the customer for the sale." [73 at ¶ 74.] With respect to lease extension options, Plaintiff admits—and the text of the contract indicates—that "Month to Month (or quarter to quarter) margin will be credited and paid upon receipt of the payments from the Lessee based on excess margin above the Threshold amounts." [*Id.* at ¶ 70.] Nothing about these terms suggests that Plaintiff earned commissions for transactions not yet marketable at the time of lease origination. They demonstrate instead that margin transactions are not included in "new lease originations" in the relevant commission plans—as margin transactions may never come into existence—and thus Plaintiff earns commissions for margin transactions, if ever, when the margin

transaction is completed, not months or often years prior, when the lease is originated. And, correspondingly, commissions for margin transactions are determined by the commission plan in force at the time the transaction is completed. In other words, margin transactions completed in 2017 are governed by a 2017 Commission Plan, regardless of whether the lease was originated in a prior year.

Furthermore, the 2017 Commission Plan was neither an attempt to renegotiate past commission terms, nor an effort to reduce commissions already earned. As Plaintiff's at-will employer, Defendants had the right to unilaterally changes the terms for commissions in 2017 and any subsequent year, and consideration was not required to create a binding agreement between Plaintiff and Defendants. See *Duberville v. WMG, Inc.,* 2015 WL 186834, at *8 (N.D. Ill. Jan. 13, 2015) (citations omitted).

In claiming a right to "consideration" beyond his mere signing of the 2017 Commission Plan and continued employment, Plaintiff relies on *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140 (Ill. 1999), in which the Illinois Supreme Court addressed "an employer's power to make unilateral changes to provisions in an employee handbook, in the absence of a previous reservation of the right to do so, that would operate to the disadvantage of existing employees." 708 N.E.2d at 1144. The dispute in that case arose over the defendant employer's attempt to establish a new employee termination policy in 1986 that differed from the policy in place when plaintiff employees were first hired in 1971 and 1972. The latter policy included a statement that "[t]he employment relationship between the Hospital and any employee may be terminated at any time by the Hospital or the employee with our without notice." *Id.* at 1143. The former policy, however, contained no such language, and was significantly more favorable to employees facing termination. When the four plaintiffs were discharged in 1991, they asserted a breach of contract claim against the

13

Hospital alleging that their discharges violated the 1971 and 1972 handbooks issued to them when they began their employment. Thus, the court considered whether the defendant had the right to change the terms of discharge "*in the absence of a previous reservation of the right to do so.*" *Id.* at 1144 (emphasis added).

It is unclear whether Plaintiff views the original Sales Employee Agreement or the annual commission plans as analogous to the employee handbook referenced in *Doyle*. The Court sees nothing in either document to suggest any deviation from an at-will employment relationship. To the contrary, the Sales Employee Agreement established the terms of Plaintiff's employment from day one and stated clearly and in bold type: "**At-will employment is not for any specific term and may be terminated by you or First Financial at any time, with or without cause**." [67-5 at 5.] And it is undisputed that each annual commission plan ran from January 1 to December 31 of the calendar year in which it was in effect, thus conferring no rights or obligations that extended to the following year. In short, this case is governed by *Geary*, not *Doyle*.

The Seventh Circuit has addressed this scenario somewhat recently in *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967 (7th Cir. 2018). There, as here, the plaintiff rested a breach of contract claim on an amendment to the terms of her employment that she contended was invalid because the employer imposed the amendment without consideration. The Seventh Circuit recognized that "in Illinois an employer's policy can create contractual rights that the employer cannot amend unilaterally without consideration," and further noted the presence of a "threshold question"—namely, "whether there was a binding contractual term to start with." *Id*. at 972. The plan at issue specifically said that it was "not and should not be thought of as a contract of employment other than at-will." *Id*. Citing *Geary*, the court of appeals concluded that "[g]iven this language, [plaintiff] could not reasonably have treated the [defendant's] plan as having created

14

binding, prospective contractual rights that could not be changed without new consideration." *Id*. The same is true here.

## 2. Acceptance

Plaintiff further argues that even if consideration was not required, the 2017 Plan is invalid nonetheless because he did not accept the new terms. Under Illinois law, when an employer exercises its right to unilaterally modify its compensation terms, an at-will employee "is deemed to have accepted the change" if he "continues to work after a change in commission plan." *Duberville*, 2015 WL 108539834, at \*8 (citations omitted). And, as noted above, "[t]his is true even if the employee's continued performance is 'grudging and protest-filled.'" *Id.* (quoting *Schoppert v. CCTC Int'l, Inc.*, 972 F.Supp. 444, 447 (N.D. Ill. 1997)).

Plaintiff argues that notwithstanding his signature on the 2017 Commission Plan and his continued employment with First Financial through 2017 until January 2018, he did not accept the terms of the plan. In support of this argument, Plaintiff unsuccessfully attempts to distinguish his case from two others that undermine his position. *Geary* is most on point. There, Plaintiff brought a claim against his former employer alleging that defendant breached an agreement to pay commissions by modifying plaintiff's commission plan, among others. The court affirmed the trial court's grant of summary judgment on plaintiff's breach of contract claim, holding that "Defendant had the right to change unilaterally plaintiff's compensation plan because plaintiff was an employee at-will," and rejecting Plaintiff's argument that he had not accepted the modified contract. 793 N.E.2d at 700. The court determined that Plaintiff accepted the modifications "when he accepted payment of commissions under the April 1996 plan and continued employment." *Id.* In trying to distinguish *Geary*, Plaintiff asserts that *Geary* "applies to modifications of employment contracts which are prospective in nature and not retrospective." [75 at 9.] As discussed above,

however, the 2017 Plan is not a retroactive modification of Plaintiff's terms of commission; it proactively modifies the compensation structure for margin transactions completed in 2017.

*Bartinikas v. Clarklift of Chi. N., Inc.*, 508 F. Supp. 959 (N.D. Ill. 1981), likewise does not help Plaintiff's case. To begin, *Bartinikas* was decided two decades before *Geary*, and federal courts exercising diversity jurisdiction are bound to apply state law as they find it at the time of their decision. As explained above, the Court finds *Geary* to reflect contemporary Illinois law on the dispositive issues in this case. See *Anthony Marano Co. v. Passof*, 2012 IL App (1st) 112853-U, ¶ 20 ("we do not consider *Bartinikas* to be the best recitation of the current state of the law on this topic"). Moreover, *Bartinikas* is factually distinguishable. To be sure, the court there concluded that the plaintiff had not assented to his employer's attempted modifications to his employment contract even though he continued working for the defendant-employer. Significantly, however, the employee in that case refused to sign the contract as modified, and "specifically and repeatedly rejected the modification." 508 F. Supp. at 962. Here, Plaintiff voiced his objection to the 2017 Plan but returned a signed document to First Financial. Even if Plaintiff's continued work was "grudging and protest-filled," *Duberville*, 2015 WL 186834, at *8, his decision ultimately to sign the 2017 Plan and continue working at First Financial through 2017 affirmed his acceptance of the terms of the 2017 Plan.

The Seventh Circuit addressed Plaintiff's acceptance argument as well in *Sutula-Johnson*. As the court of appeals noted, again citing *Geary*, "even though Office Depot could change Sutula-Johnson's compensation plan without consideration, she needed to give express assent to the new plan before it took effect." 893 F.3d at 972. In that instance, the plaintiff was deemed "to have accepted the Office Depot plan when she continued to work after Office Depot told her about the new plan and began paying her under its terms." *Id*. at 972-73. It did not matter that she "objected

16

orally and refused to sign the written policy" until months after receiving notice of it. *Id*. In short, the plaintiff "accepted Office Depot's new terms by continuing to work." *Id*. Again, the same is true here.

### B. IWPCA

Under the IWPCA, "every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3. "Wages" under the Act are defined as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2. As the parties agree [see 67, at 13; 75 at 11], Plaintiff's IWPCA claim "really is just, in this case, a statutory form of breach of contract claim." [75, at 11.] Plaintiff's IWPCA claim thus falls with his breach of contract claim, because "[t]he plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations." *Palmer v. Great Dane Trailers*, 2005 WL 1528255, at *3 (N.D. Ill. June 28, 2005).

## IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment [66] on all three remaining claims is granted, and Plaintiff's motion for summary judgment [72] is denied. A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Plaintiff. Civil case terminated.

Dated: May 18, 2022

_____
Robert M. Dow, Jr.
United States District Judge